```
              IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF GEORGIA
                        ATHENS DIVISION
```

```
JOSE ROMAN,                     *
     Plaintiff,                 *
vs.                             *
                                       CASE NO. 3:14-CV-20 (CDL)
LEGGETT AND PLATT, INC.,        *
     Defendant.                 *
```

O R D E R

Plaintiff Jose Roman tested positive for phenobarbital during a random drug screening conducted by his employer, Defendant Leggett and Platt, Inc. Upon confirming the positive result, Leggett terminated Roman's employment consistent with its policy. Roman does not seriously dispute that his test showed a positive result, but he argues that it was likely a false positive or due to some reason other than his ingestion of non-prescription drugs containing phenobarbital. While Roman may quarrel with the test results and his subsequent termination, he points to no evidence to support his claim under the Americans with Disabilities Act that he was discharged because of his epilepsy. Specifically, he fails to create a genuine factual dispute on the issue of whether Leggett's stated reason for terminating him, the positive drug test, was a

pretext for disability discrimination. Accordingly, Leggett's motion for summary judgment (ECF No. 25) is granted.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A fact is *material* if it is relevant or necessary to the outcome of the suit. *Id.* at 248. A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Id.*

## FACTUAL BACKGROUND

Viewed in the light most favorable to Roman, the record reveals the following. Roman worked on the production floor of Leggett's mattress innerspring manufacturing facility in Monroe, Georgia. Leggett had a substance abuse policy that prohibited employees from working with "unacceptable levels of drugs or alcohol in their systems" because "[t]he abuse of drugs and alcohol can cause a serious threat to a safe and productive work environment." Roman Dep. Ex. 6, Substance Abuse Policy, ECF No.

28-1 at 68. The policy also prohibits "abuse or improper use of prescription or over-the-counter drugs." *Id.* An employee who violates the substance abuse policy is "subject to immediate and severe disciplinary action, up to and including termination of employment for the first offense." *Id.* Roman was aware of the substance abuse policy and knew that failing a drug test could result in his termination.

Leggett considered Roman's position to be safety sensitive. Employees working safety sensitive positions were subjected to random drug screenings "to determine the possible presence of substances of abuse." *Id.* Clinical Reference Laboratory analyzes the random drug screen samples of Leggett employees and reports the results to Leggett. Clinical's analysis is designed to test for the presence of substances in the employee's body in an amount above a "cutoff level." In 2011, Leggett employees were tested for the presence of barbiturates, which remains detectable in a person's system for at least a week after ingestion. The cutoff level used by Clinical for barbiturates in oral fluid samples is twenty nanograms per milliliter (20 ng/mL). Irving Dep. 20:3-13, ECF No. 36. That is the level Clinical and several other major testing laboratories usually set as the cutoff level for barbiturates unless the employer requests a different cutoff level. *Id.* at 17:1-12, 54:19-55:3. If Clinical's first test of an employee's oral fluid sample

detects a substance in an amount above the cutoff level, then Clinical runs a secondary confirmation test on the sample. If the confirmation test detects a substance in an amount above the cutoff level, then Clinical reports a positive test result to the employer.

Clinical reports any positive test results for Leggett employees to Jenny Madsen, Leggett's employee relations coordinator. Madsen then contacts the human resource manager at the employee's branch to report the positive result. In 2011, the human resource manager at Leggett's Monroe facility was Mick Crain. When Crain is notified of a positive test result, he removes the employee from the production floor and notifies the employee of the test results. The employee is given an opportunity to show Leggett that the result should be excused by producing information about the employee's prescription medication. If the employee cannot convince Leggett that the result should be excused (for example, as a false positive caused by a medication for which the employee has a prescription), then the employee is terminated. Altman Dep. 134:19-135:18, ECF No. 34.

Roman and other employees working in safety sensitive positions of Leggett's Monroe facility were subjected to random drug screenings. Each month, a random sample of employees was tested for drugs. Roman was selected for the random drug screen

in January 2011.  The drug test, conducted by Clinical, was based on an oral swab and tested for barbituates above the cutoff level of 20 ng/mL.  Roman's January 2011 test was negative.  Roman was selected for the random drug screen on September 7, 2011.  Again, Clinical conducted the drug test, which was based on an oral swab.  This time, however, Roman's sample tested positive for phenobarbital, a barbiturate, with a concentration of 44 ng/mL.  During the timeframe relevant to this action—in both January 2011 and September 2011—Roman took Dilantin to treat his epilepsy, and his dosage did not change. He also took methotrexate to treat rheumatoid arthritis.

Clinical reported Roman's positive test result to Madsen, who reported the result to Crain.  She told Crain that if Roman contested the positive result, Crain should collect information regarding Roman's prescription medications.  When Roman reported to work on September 14, 2011, Crain told him that his drug test had come back positive and that he could not work that day. Roman requested a copy of his test results and told Crain that he would come back the next day with his prescription medication information.

Roman returned to Crain on September 15, 2011 and showed him several prescription bottles.  Crain or his assistant wrote down the name of each prescription, including the epilepsy medication Dilantin, and faxed the list to Madsen.  It is

5

undisputed that no one at Leggett knew that Roman had epilepsy until Roman disclosed that he took Dilantin. Madsen sent the list to Clinical, whose certifying scientists were not able to verify that any of Roman's medications could have caused the positive test result.[1] Madsen Decl. ¶ 18, ECF No. 31-1. Madsen relayed the information to Michael Altman, Leggett's director of labor relations. Altman spoke with Crain, who told Altman that Roman was a valuable employee who should be retained if possible. Altman told Crain that none of Roman's prescription medications explained the positive result, and Altman said that if Roman could not provide an adequate explanation for the positive drug test, he would be terminated. Altman Dep. 73:6-13. Crain, in turn, told Roman that none of his prescription medications explained the positive result. Roman said he had additional information and would give it to Crain.

Roman's daughter found information on the internet suggesting that Roman's epilepsy medication, Dilantin, may cause false positives in drug tests, and Roman contacted his primary care physician, Dr. Suzanne Lester, to investigate the

---

[1] Roman contends that this fact is disputed by pointing to a communication between Madsen and Clinical's toxicology director, who stated that he did not see "any medications in [Roman's] record that will cause a positive phenobarbital" and that "Dilantin will not cause a positive for phenobarbital." Pl.'s Mot. for Summ. J. Ex. 25, Email from John Irving to Jenny Madsen (Sept. 27, 2011), ECF No. 32-21. This evidence does not refute Madsen's statement that Clinical's certifying scientists could not verify that Dilantin could cause a false positive for barbiturates.

possibility that one of his medications caused a false positive. Dr. Lester wrote a letter stating: "It is my understanding that in some cases of drug screening that the prescription drug Dilantin or Phenytoin may give a False Positive result for Barbiturates and Phenobarbital."  Crain Dep. Ex. 18, Letter from Dr. Suzanne Lester (Sept. 27, 2011), ECF No. 35-18.  She also stated that Roman was taking Dilantin and suggested "further testing to differentiate between Phenobarbital and Phenytoin/Dilantin."[2]  *Id.*  Roman presented the letter to Crain on September 27, 2011—nearly three weeks after his original drug test.  Crain sent the letter to Altman.

At that point, Madsen sought input from Clinical's toxicology director, John Irving.  She provided Irving with a list of Roman's medications—including Dilantin and methotrexate—as well as a note from Roman's doctor.  Madsen Decl. ¶¶ 20-21. Irving responded that he did "not see any medications in the donor'[s] record that will cause a positive phenobarbital." Pl.'s Resp. Ex. 25, Email from John Irving to Jenny Madsen (Sept. 27, 2011 at 3:57 PM), ECF No. 32-21.  He further stated, "Dilantin will not cause a positive for phenobarbital."  *Id.*

On September 29, 2011—more than three weeks after the original drug test—Roman took two more drug tests.  One of the

---

[2] Roman admitted that he did not understand this issue; Dr. Lester later told him that Dilantin would not cause a false positive for barbiturates.  Roman Dep. 110:4-19, ECF No. 28.

7

tests was negative for barbituates. The other was positive for barbiturates, although Dr. Jan Bennett, the doctor who reviewed that drug screen and Roman's medications, wrote that she was "strongly convinced that a false positive could be obtained from Keppra or methotrexate." Pl.'s Resp. Ex. 15, Note from Jan M. Bennett, D.O., Oct. 14, 2011, ECF No. 32-16. There is no evidence in the present record that Roman was taking Keppra at the time of any of his drug screens. *See* Pl.'s Resp. Ex. 6 at LP 00038, Memo from Eric M. Pitts, M.D., Aug. 29, 2011, ECF No. 32-7 at 3 (noting that Roman "was unable to tolerate Keppra and has returned to Dilantin, no further problems"). There is evidence that Roman was taking methotrexate. Pl.'s Resp. Ex. 25, Email from Jenny Madsen to John Irving (Sept. 27, 2011 at 2:21 PM), ECF No. 32-21. Methotrexate was on the list of medications that Madsen initially gave to Irving, which Irving reviewed and said that he did "not see any medications in the donor'[s] record that will cause a positive phenobarbital." Pl.'s Resp. Ex. 25, Email from John Irving to Jenny Madsen (Sept. 27, 2011 at 3:57 PM), ECF No. 32-21.

Altman did not consider the two additional drug tests and did not send the results to Clinical because Altman was only concerned about the results of the first drug test, which had taken place more than three weeks earlier. Altman Dep. 63:12-64:1. Altman also did not give any weight to Dr. Bennett's

8

letter because "she is a medical doctor, not a clinical-drug-test analyst trained in the fingerprinting of drugs." *Id.* at 67:22-68:3.  Instead, Altman relied on Clinical's expertise in the field. *Id.* at 68:3-6.  Roman did not provide any additional documentation to explain the positive result from the September 7 drug test, and Leggett terminated him on October 18, 2011.

## DISCUSSION

The Americans with Disabilities Act prohibits covered employers from discriminating against their employees on the basis of disability.  42 U.S.C. § 12112(a).  To establish a discrimination claim under the ADA, a plaintiff must prove that he suffers from a disability, he is a qualified individual able to perform the essential functions of his job, and his employer unlawfully discriminated against him because of his known disability.  *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000) (per curiam).  Where, as here, there is no direct evidence that the employer discriminated against the employee because of his disability, the courts use the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).[3]  *Earl*, 207 F.3d at 1365.  Under

---

[3] Roman suggests in a footnote of his brief that there is direct evidence of disability discrimination in this case because Leggett learned of Roman's disability and terminated him even though Roman contended that the September drug test result was a false positive. Under Eleventh Circuit precedent, "'only the most blatant remarks,

9

that framework, a plaintiff must establish a prima facie case of disability discrimination by showing that (1) he has a disability within the meaning of the ADA, (2) he is a qualified individual, and (3) he was subjected to unlawful discrimination because of his disability.  *Id.*  If the plaintiff establishes a prima facie case, the employer may offer a legitimate nondiscriminatory reason for its decision.  *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc).  If the employer offers a legitimate nondiscriminatory reason for its decision, the plaintiff must show that the proffered explanation is pretext for discrimination.  *Id.*  "If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim."  *Id.* at 1024-25.

The Court assumes for purposes of summary judgment that Roman has established a prima facie case of disability discrimination.  It is undisputed that Roman has epilepsy, and Leggett does not contest for purposes of the present motion that epilepsy is considered a disability under the current version of

---

whose intent could be nothing other than to discriminate on the basis of age' will constitute direct evidence of discrimination." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1359 (11th Cir. 1999) (quoting *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081-82 (11th Cir. 1990)).  If there were evidence that Altman said, "Fire Roman because he has epilepsy," that would be direct evidence of disability discrimination.  But Roman pointed to no such evidence.

the ADA. *See* 29 C.F.R. § 1630.2(j)(3)(iii) (noting that "epilepsy substantially limits" the major life activity of "neurological function"). Leggett does not dispute that at the time of his termination, Roman was adequately performing the essential functions of his job. And Leggett cannot seriously dispute that it terminated Roman soon after learning that he was taking prescription medication for epilepsy.

Leggett proffered a legitimate nondiscriminatory reason for terminating Roman: Roman failed a random drug screen and tested positive for phenobarbital. So the dispositive issue is whether Roman pointed to sufficient evidence to establish pretext by showing that Leggett's proffered "reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993). "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman*, 229 F.3d at 1030. Federal courts "do not sit as a super-personnel department that reexamines an entity's business decisions." *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (quoting *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir. 1988)). The key question is "whether the employer gave an honest explanation of its behavior." *Id.* (quoting *Mechnig*, 864 F.2d at 1365). "The

11

inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of his performance." *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997) (per curiam).

Roman contends that Leggett's proffered reason is false because he did not actually fail his drug test. But the undisputed evidence is that the drug test did come back with a positive result for phenobarbital. Roman argues that the test result was a false positive.[4] But, the relevant question for the pretext inquiry is whether there is enough evidence to suggest that Altman, the decisionmaker, did not honestly believe that Roman failed to provide an adequate justification for his positive September 7, 2011 drug test.

In determining whether he believed that Dilantin could have caused a false positive, Altman knew that (1) Clinical's toxicology director unequivocally stated that Dilantin would not cause a false positive for phenobarbital, (2) Clinical's certifying scientists could not verify that any of Roman's medications (including Dilantin) could have caused the positive test result, and (3) while Dr. Lester understood that Dilantin might give a false positive for phenobarbital in some cases, Dr. Bennett did not list Dilantin as a possible cause of Roman's

---

[4] The fact that he had a negative test result in January 2011 but a positive test result in September despite taking the same medications undercuts this argument.

12

positive test result. And in determining whether he believed that methotrexate could have caused a false positive, Altman knew that (1) Clinical's toxicology director unequivocally stated that none of Roman's medications (including methotrexate) would cause a false positive for phenobarbital, (2) Clinical's certifying scientists could not verify that any of Roman's medications (including methotrexate) could have caused the positive test result, and 3) Dr. Bennett listed methotrexate as a possible cause of Roman's positive test result (though Dr. Lester did not).

In summary, Altman received conflicting information on whether two of Roman's medications could have caused a false positive. The scientists at the company Altman trusted to perform Leggett's drug tests explicitly stated that Roman's medications would not cause a false positive for barbiturates. On the other hand, Altman received letters from two doctors, each of whom suggested that one of Roman's medications might cause a false positive. But the two doctors did not point to the same medication as the culprit—so Roman's own submissions to Leggett were in conflict. Based on this evidence, it was not unreasonable for Altman to conclude that Roman did not present sufficient information to excuse the September 7 positive drug test. Moreover, the present record does not support a finding that Altman's conclusion was pretext for discriminatory animus.

Roman pointed to no evidence that Leggett retained any other employee where Leggett's drug tester stated that the employee's prescriptions would not cause a false positive.  Roman also did not point to any evidence that Leggett retained any other employee with an unexcused positive drug test.  For all of these reasons, the Court finds that Roman has not met his burden of establishing that Leggett's proffered reason—the positive drug test result—was false and that discrimination was the real reason for his termination.

Roman makes several other arguments that Altman's investigation of the drug test result was unreasonable.  First, Roman appears to argue that the drug tests he took in late September should have influenced Altman's decision.  But it is undisputed that the concentration of a substance in the body decreases from the time of ingestion to the time of testing, so the Court cannot find that it was unreasonable for Altman to focus solely on the September 7 drug test results.  Second, Roman contends that the amount of barbiturates Clinical found in Roman's saliva would not have a discernable effect on Roman at the time of the test.  Roman pointed to no evidence that he or anyone else submitted any information on this point to Altman.  Plus, it is undisputed that the point of the drug test is not just to determine whether an employee is under the influence of drugs at the time of the test but to determine whether the

14

employee has any drugs in his system—which may suggest abuse or improper use. Third, Roman contends that the concentration of barbiturates in Roman's saliva was likely due to contamination on the production line in the facility that manufactured Roman's Dilantin. In other words, Roman argues that phenobarbital may have been in his system due to contamination and not drug usage. Roman did not point to any evidence that he or anyone else submitted information to Altman regarding this possibility. Fourth, Roman points to a publication by a drug testing laboratory that lists Dilantin as a drug known to cause a false positive for barbiturates in urine and blood tests. Roman did not explain how the publication relates to saliva tests, and he did not point to any evidence that he or anyone else submitted the publication to Altman. Roman faults Irving, Clinical's toxicology director, for not considering the publication or the possibility of production line contamination, but Roman did not point to any evidence to suggest that Irving intentionally withheld such information from Altman because he had a discriminatory animus toward Roman.[5]

---

[5] Roman pointed to the expert testimony of Dr. Ilo Leppik in support of several of his arguments. Dr. Leppik opines that (1) the results of the drug screen do not indicate drug abuse because the testing method was too sensitive, (2) the test results were likely due to contamination, and (3) Roman's work performance would not be affected by the low levels reported. Again, the pretext inquiry centers on the employer's beliefs, and there is no evidence in the present record that Roman or anyone else made Altman aware of these potential issues when Altman investigated Roman's drug test results.

Roman also argues that Altman's response to the drug test was unreasonable. Roman contends that even if he did test positive for barbiturates, Leggett's substance abuse policy did not require his termination, so it is reasonable to infer that his termination was discriminatory. It is true that the substance abuse policy does not state that employees who violate the policy *must* be terminated. But the policy states that violators are "subject to immediate and severe disciplinary action, up to and including termination of employment for the first offense." Roman Dep. Ex. 6, Substance Abuse Policy, ECF No. 28-1 at 68. Roman did not point to any evidence that the substance abuse policy was enforced in a way that discriminated against him because of a disability.

Finally, Roman contends that Leggett's drug policy was unreasonable for three main reasons. All three reasons require the Court to second-guess the wisdom of Leggett's drug policy, which the Court may not do as long as the policy was not enacted or enforced in a discriminatory way. *See Chapman*, 229 F.3d at 1030 (noting that an employee cannot prevail "by simply quarreling with the wisdom of" the employers' decisions as long as the decisions are not motivated by a discriminatory animus). First, Roman contends that he should not have been classified as a safety sensitive employee and thus should not have been subjected to random drug tests. But Roman presented no evidence

16

on this point. In any event, he was classified as a safety sensitive employee before anyone at Leggett knew he had epilepsy, so he was not classified as a safety sensitive employee subject to random drug tests because of his epilepsy. Second, Roman argues that barbiturates are not a substance of abuse so Leggett should not have tested for them in the first place. The stated point of the substance abuse policy is to detect abuse or improper use of drugs, which may cause a threat to a safe and productive work environment. Roman pointed to no evidence that it is unreasonable for a manufacturer to prohibit its production floor employees from working after taking phenobarbital without a prescription. And even if he had, there is no evidence suggesting that Leggett adopted its policy of testing for barbiturates with a discriminatory purpose of screening employees with disabilities. It is undisputed that Leggett began testing for barbiturates months before learning that Roman had epilepsy. And third, Roman argues that the cutoff level for barbiturates in Clinical's screening was too low because that small an amount of barbiturates in a worker's system would have no discernable effect on a worker's performance. Again, the point of the drug test is not just to determine whether an employee is under the influence of drugs at the time of the test but to determine whether the employee has any drugs in his system—which may suggest improper use or abuse.

17

The Court may not second-guess the validity of a workplace policy that prohibits employees from working with minor amounts of phenobarbital in their system unless that policy is enacted or enforced in a discriminatory way. Roman pointed to no evidence that Leggett adopted the cutoff level for barbiturate testing with a discriminatory purpose. For all of these reasons, the Court concludes that Roman has not established that the policy was discriminatory.

In sum, the Court finds that Roman has not met his burden of providing sufficient evidence to create a genuine fact dispute on pretext. Leggett is therefore entitled to summary judgment.

## CONCLUSION

For the reasons set forth above, Leggett's Motion for Summary Judgment (ECF No. 25) is granted.

IT IS SO ORDERED, this 3rd day of November, 2015.

S/Clay D. Land
CLAY D. LAND
CHIEF U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA